Joseph S. GONCALVES, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2010–SC–000142–MR.

Supreme Court of Kentucky.

Feb. 21, 2013.

As Corrected March 14, 2013.

Rehearing Denied Aug. 29, 2013.

Susan Jackson Balliet, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, for Appellant.

Joseph S. Goncalves, Jr., LaGrange, KY, Appellant.

Jack Conway, Attorney General of Kentucky, Jeanne Deborah Anderson, Assistant Attorney General, Office of the Attorney General, Office of Criminal Appeals, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice ABRAMSON.

Joseph Goncalves appeals as a matter of right from a Judgment of the Nelson Circuit Court convicting him of robbery in the first degree. Ky. Const. § 110(2)(b). Finding Goncalves to be a Persistent Felony Offender in the first degree ("PFO 1") the jury enhanced his sentence from twenty to thirty-five years imprisonment, and the trial court sentenced him accordingly. Goncalves raises thirteen issues on appeal: (1) the trial court erred when it denied his suppression motion relating to evidence seized from his apartment; (2) the tendered complicity instructions violated his due process rights; (3) the Commonwealth improperly shifted the burden of proof during its closing argument; (4) the Commonwealth allowed exculpatory evidence to be destroyed in violation of *Brady v. U.S.*; (5) the trial court erred when it refused to allow him to examine the prosecutor regarding alleged prosecutorial misconduct; (6) the pretrial delay violated his rights to a speedy trial; (7) his constitutional rights to confrontation were violated when the trial court refused to allow him to play video-recorded testimony to the jury to

impeach two witnesses; (8) as a *pro se* litigant, his due process rights were violated when he was granted insufficient access to legal materials; (9) his due process rights were violated when he received inadequate access to a law library; (10) the trial court erred when it denied his motion for a directed verdict based on the unreliability of the Commonwealth's witnesses; (11) his constitutional rights were violated when he failed to receive a sufficient trial record to prepare for this appeal; (12) the fifty-page limit on appellate briefs imposed by this Court violated his constitutional rights; and (13) the trial court erroneously ordered the payment of public defender fees and court costs. For the reasons set forth herein, we reverse and remand the portion of the judgment imposing the public defender fees and court costs, and affirm the Nelson Circuit Court in all other respects.

## RELEVANT FACTS

On February 4, 2008, the Boston Beverage Depot in Nelson County, Kentucky, was robbed by three individuals wearing ski masks. The robbers threatened store clerk Louis Hall with a gun and forced him to open the store's safe. Hall complied and was knocked to the ground while the intruders emptied the safe. Nelson County Sheriff Office's Detective Ed Mattingly was assigned as lead investigator to the case. When Detective Mattingly arrived at the Boston Beverage Depot on the morning of the robbery, he interviewed Hall and manager Todd Buster. Buster arranged for Bardstown Alarm technician Mike Van Dyke to transfer the store's surveillance camera footage from the computer hard-drive to a CD. Mattingly, Buster, and Van Dyke viewed the footage and observed three individuals enter the store and leave with approximately $3,000 in cash from the store's safe.

The following day in neighboring Hardin County, law enforcement officers assigned to the Greater Hardin County Drug Task Force ("task force") stopped a vehicle belonging to Gerald Jones of Leitchfield, Kentucky, on the suspicion that it was being used to transport individuals to purchase items to manufacture methamphetamine. Present in the vehicle were Jones, Brittany Bratcher, and Travis Basham. During the course of the stop, the officers learned that there was an un-served warrant for Jones's arrest for an alleged probation violation. Jones consented to a search of the vehicle, where officers discovered bottles of liquor and other items related to the Boston Beverage robbery in the trunk of the vehicle. After he was taken into custody, Jones was advised of his rights and consented to answering questions regarding the robbery. He admitted to committing the robbery with Jenny Giguere and Joseph Goncalves of Leitchfield, Kentucky. Jones stated that Goncalves provided the weapons used in the robbery, including a .22 caliber long-barreled pistol and a second handgun. The officers contacted Detective Mattingly and relayed this information. That same day, Mattingly obtained a warrant for Goncalves's arrest.

Goncalves was arrested on February 5, 2008, at his Leitchfield apartment. While executing the arrest warrant, police officers observed a .22 caliber long-barreled pistol and a marijuana pipe in plain view on the kitchen table. They also found a second individual, David Willoughby, in the apartment with Goncalves. Willoughby told the officers that earlier that day, he and Goncalves had driven around Grayson County in search of Jones, whom Goncalves suspected of stealing drugs and guns from him. Willoughby also stated that Goncalves had armed himself with a .22 caliber pistol while he searched for Jones.

The officers provided this information to task force Detective Sergeant Todd Cave, who had been in contact with Detective Mattingly throughout the investigation. Based on that information, as well as the information that the members of the task force learned from Jones, Detective Sergeant Cave prepared and executed an affidavit for a search warrant of Goncalves's residence. Once the search warrant was signed by a Grayson District Court judge, Detective Sergeant Cave and other officers searched the apartment, where they seized a .22 caliber long-barreled pistol, a marijuana pipe, nine rounds of ammunition, a set of electronic scales, two ski masks, duct tape, binoculars, a blue duffle bag containing various knives, and other items.

Goncalves was indicted by a Nelson County Grand jury, and his trial began on March 23, 2009. A mistrial was declared when the jury was unable to reach a unanimous verdict. A second trial began on July 22, 2009, and a mistrial was declared in that trial when the jury again deadlocked. His third trial began on February 8, 2010. The trial court heard testimony from Jones and Giguere, who both identified Goncalves as one of the perpetrators. Jones also testified that it was Goncalves who provided the weapons and knocked Hall to the ground. Willoughby testified that Jones admitted to committing the robbery with Giguere and Goncalves, and showed him items in the trunk of Jones's car which were taken from the store. Goncalves was ultimately convicted of first-degree robbery and PFO 1.

### ANALYSIS

Before we commence with our analysis of the issues, we must first address the manner in which the appellant has referenced the record in his brief. To support many of his claims, Goncalves frequently references testimony and evidence presented in the first and second trials. Our appellate jurisdiction is limited to final orders and judgments, and therefore we decline to address any alleged errors or events arising from non-final orders from Goncalves's first or second trial. *See* Kentucky Civil Rule ("CR") 54.01; *Wilson v. Russell,* 162 S.W.3d 911 (Ky.2005). As stated in CR 76.12(4)(c)(v) an appellate brief must present an argument with "supportive references to the record." References to the first and second trials in this matter fail to conform to the CR 76.12 standard, and therefore we will not address those arguments. *See Beshear v. Haydon Bridge Company, Inc.,* 304 S.W.3d 682 (Ky.2010). *See also Harris v. Commonwealth,* 384 S.W.3d 117, 130 (Ky. 2012) (mistrial following hung jury is a "non-event" per *Yeager v. U.S.,* 557 U.S. 110, 129 S.Ct. 2360, 174 L.Ed.2d 78 (2009)). Unless otherwise specified, all references to a "trial" in this opinion refer to the third trial, held on February 8–12, 2010.

### I. The Trial Court Properly Denied Goncalves's Motion to Suppress Evidence Seized From His Apartment.

Goncalves claims that the trial court erred when it did not suppress the evidence seized from his apartment after his arrest. Goncalves contends that there was no arrest warrant in existence at the time of his arrest, and therefore the officers were illegally present in his residence when they observed incriminating items in plain view. He also claims that the subsequent search warrant for his apartment was invalid because it was based on unreliable information.

Goncalves moved to suppress all evidence seized from his apartment on the grounds that his arrest was executed without a warrant. A suppression hearing was conducted prior to the first trial, where the trial court heard testimony from Detective

Sergeant Todd Cave, Nelson County Sheriff Mike Newton, and Detective Mattingly. At the conclusion of the hearing, the trial court found that Detective Mattingly obtained a warrant for Goncalves's arrest prior to officers entering Goncalves's apartment. The trial court further concluded that the Grayson District Court judge had sufficient grounds under the "totality of the circumstances" test established in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) to believe that probable cause existed for the subsequent issuance of a search warrant for Goncalves's residence. Prior to the beginning of his third trial, Goncalves asked the court to reconsider its decision on the motion to suppress in light of new evidence obtained over the course of the two earlier trials. The trial court allowed him to provide a timeline of testimony and evidence to supplement his original motion to suppress. However, the trial court did not alter its original ruling and the evidence was admitted.

■■■ This Court reviews a trial court's decision on a motion to suppress by applying a two-step analysis. First, we must determine if the trial court's findings of fact are supported by substantial evidence. *Adcock v. Commonwealth,* 967 S.W.2d 6 (Ky.1998); *Peyton v. Commonwealth,* 253 S.W.3d 504 (Ky.2008). Findings of fact supported by substantial evidence are conclusive. Kentucky Rule of Criminal Procedure ("RCr") 9.78. Second, the Court will conduct a *de novo* review of the trial court's application of the law to the facts to determine if the suppression decision was correct as a matter of law. *Adcock,* 967 S.W.2d at 8. After careful review, we find that the trial court did not err in denying

Goncalves's motion to suppress the evidence seized at the apartment.

**a. Goncalves's Arrest.**

In denying the motion to suppress, the trial court concluded that a valid arrest warrant was obtained prior to Goncalves's arrest. During the suppression hearing, Sheriff Newton testified to preparing an arrest warrant for Goncalves containing information supplied to him by Detective Mattingly. According to his testimony, after the arrest warrant was signed by a judge, Sheriff Newton faxed the warrant from the Commonwealth's Attorney's office in Nelson County to Detective Mattingly in Grayson County. Detective Mattingly testified to receiving the arrest warrant at the Leitchfield Police Department via fax prior to the arrest. On cross-examination, Detective Mattingly denied not having a warrant when officers entered the apartment, and explained that if that were true, Goncalves would have been arrested *before* he entered his apartment that evening.[1]

■■■ We believe that the trial court's determination that an arrest warrant existed at the time of Goncalves's arrest was supported by substantial evidence. "Substantial evidence" means evidence, taken alone or in light of other proof, that a reasonable mind would find sufficient to support a conclusion. *Moore v. Asente,* 110 S.W.3d 336 (Ky.2003). A peace officer need not have a warrant "in hand" in order to execute a valid warrant. RCr 2.10. The evidence presented at the suppression hearing supports the trial court's conclusion that the officers who arrested Goncalves waited outside of the apartment until a valid arrest warrant was received via fax by Detective Mattingly. Both Sheriff

---

**1.** The members of the task force testified that they observed Goncalves arriving at the apartment and walking his dog prior to entering the residence. They waited for the warrant to issue before approaching the residence.

Newton and Detective Mattingly, the individuals on the "sending" and "receiving" ends of the faxed arrest warrant transmission, testified to its existence *prior* to the arrest.

Goncalves contends that Sheriff Newton unequivocally "confirmed" that he was arrested without a warrant. However, Sheriff Newton's statement that an arrest warrant did not exist at "7:49 P.M." was made in the course of his trial testimony, *not* during the suppression hearing.[2]

Goncalves argues that the timestamp on the faxed arrest warrant, which reads "8:17 PM," proves that he was arrested without a warrant at 7:49 PM Central Standard Time ("CST"). However, the timestamp on the fax does not confirm or disprove the existence of the arrest warrant. The timestamp simply reads "8:17 PM." As noted by the Commonwealth in its brief, the arrest warrant was faxed from Nelson County, located in the Eastern Time Zone, to Grayson County, located in the Central Time Zone. With the one hour time difference between Nelson and Grayson County, it would be reasonable to assume that the warrant was faxed at 8:17 PM EST (7:17 PM CST), with the sending machine affixing the timestamp. However, the calibration of the Nelson County Commonwealth's Attorney's office's fax machine was never verified for the trial court at the suppression hearing. In fact, Detective Mattingly testified during the suppression hearing to not knowing if the time on the Grayson County machine was set correctly the evening of the arrest. Therefore, it seems equally reasonable that the time may have been incorrectly

calibrated on one or both of the fax machines.

Nevertheless, the testimonies presented at the suppression hearing reasonably support the conclusion that an arrest warrant existed prior to 7:49 PM CST. Aside from the timestamp argument, which is too speculative to controvert the testimony of Mattingly, Newton, and Cave, there was no evidence offered at the suppression hearing to prove that Goncalves was arrested without a warrant. Therefore, we conclude that the trial court's finding that an arrest warrant existed when Goncalves was arrested in his apartment was supported by substantial evidence.

### b. Search of the Apartment.

In his suppression motion, Goncalves also claimed that the search warrant issued after his arrest was based on unreliable information. During the suppression hearing, Detective Mattingly testified that he was contacted by the Hardin County Drug Task Force after members of the task force stopped a vehicle belonging to Gerald Jones and discovered items in the vehicle that they believed were linked to the Boston Beverage Depot robbery. Jones was arrested and later admitted to his involvement in the robbery. He identified Jennie Giguere and Goncalves as accomplices, stating that Goncalves provided Jones with a .22 caliber long-barrel handgun to commit the robbery. Jones further stated that Goncalves also carried a handgun during the robbery. Detective Mattingly contacted Sheriff Newton in Nelson County to secure arrest warrants for Giguere and Goncalves. After Goncalves's arrest, the officers interviewed David Wil-

---

**2.** During Sheriff Newton's direct examination, Goncalves informed him that the faxed arrest warrant, admitted as "Defense Exhibit 4," bore an "8:17 PM Central Standard Time" timestamp. Goncalves then asked if at "7:49 Central Standard Time, did anyone have an arrest warrant for me?" to which Sheriff Newton replied, "The way I understand it, no." During this line of inquiry, Goncalves misrepresented the timestamp on the warrant. The timestamp reads "8:17 PM" without a time zone designation.

loughby, who was present in the apartment at the time of the arrest. Willoughby stated that an agitated Goncalves, armed with a handgun, had searched for Jones earlier that day, suspecting that Jones had stolen drugs and money from him. Willoughby further stated that there were two ounces of marijuana in the apartment, as well as a second handgun hidden under the couch. The arresting officers provided this information to Detective Sergeant Cave who, along with Detective Mattingly, prepared the affidavit for a search warrant to search Goncalves's apartment. In addition to the statements from the task force officers who stopped Jones's vehicle, Detective Sergeant Cave included in the-affidavit information from Detective Mattingly's investigation at the scene, statements provided by Willoughby after the arrest, and information concerning the items the arresting officers observed at Goncalves's apartment when arresting Goncalves. A search warrant was prepared and signed by a Grayson District Court judge, and a search of the apartment was conducted the following day, February 6, 2008.

In its order denying Goncalves's motion, the trial court applied the *Gates* "totality of the circumstances" test to determine if the district judge made a proper determination regarding the existence of probable cause. 462 U.S. at 238, 103 S.Ct. 2317. The trial court concluded that the statements from Detective Sergeant Cave regarding what he had learned of the robbery from Sheriff Newton, the information gleaned from the task force officers who stopped Jones, statements from Willoughby on the day of the arrest, and information concerning items observed in plain

view during that arrest were sufficient to support the district judge's determination that probable cause existed. Goncalves now complains that the search warrant was invalid because it was based on an affidavit containing unreliable and incomplete information.[3] He claims that the affidavit was based on statements made by "unreliable accomplice snitches," "unnamed police sources," and not based on Detective Sergeant Cave's personal knowledge.

When faced with a motion to suppress evidence obtained pursuant to a search warrant, the trial court must determine whether, under the "totality of the circumstances," the warrant-issuing judge had a substantial basis for concluding probable cause existed. *Commonwealth v. Pride*, 302 S.W.3d 43 (Ky.2010). Under the "totality of circumstances" test, a judge need only "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238, 103 S.Ct. 2317. A trial court must give great deference to the warrant-issuing judge's determination of probable cause. *Id.* at 213, 103 S.Ct. 2317. Evidence directly obtained as a result of an illegal search must be excluded, as well as its "fruit," or evidence subsequently obtained as a result of the illegality. U.S. Const. Amend. 4.; *Segura v. U.S.*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984); *see also Quintana v. Commonwealth*, 276 S.W.3d 753 (Ky.2008) (evidence found as a result of an improperly obtained search warrant must be suppressed).

---

**3.** Goncalves also claims that the affidavit included information concerning the items observed by the officers during his arrest. Having concluded that his arrest was executed pursuant to a valid warrant, we are convinced that the officers were legally present in Goncalves's apartment when they observed the items in plain view. Therefore, we need not address this prong of his argument.

■ Upon review of the record, it is clear that the trial court's determination that the warrant-issuing judge had a substantial basis for finding probable cause was supported by substantial evidence. The facts in the affidavit, specifically Willoughby's statements and Jones's implication of Goncalves, certainly support a "common-sense" determination by the warrant-issuing judge that evidence of a crime would be found at Goncalves's residence. *Gates*, 462 U.S. at 238, 103 S.Ct. 2317.

Goncalves relies on this Court's decision in *Talbott v. Commonwealth*, 968 S.W.2d 76 (Ky.1998), which requires an affiant who receives information concerning a crime from another person to disclose the name of the informant and the factual observation made by the other person. We find the affidavit to be in compliance with the rule set forth in *Talbott*. Not only does the affidavit name Jones and Willoughby, it also provides details to support the factual observations that were relayed to Detective Sergeant Cave, rather than simply stating an "ultimate fact." *Id.* at 81 (an "ultimate fact" affidavit, stating merely that the defendant committed a particular crime, was insufficient to support a finding of probable cause where affidavit was not based upon the personal knowledge of the affiant).

Goncalves also argues that information was omitted from the affidavit, rendering the resulting search warrant defective. Specifically, Goncalves claims that the affidavit failed to reveal the fact that Jones, Willoughby, Basham, and Bratcher were "drug-addicted accomplices" who were "known to be unreliable." However, the fact that a warrant does not contain recitations of a named informant's veracity or reliability does not prove that the warrant was issued without probable cause. *Lovett v. Commonwealth*, 103 S.W.3d 72 (Ky. 2003).

The trial court did not err in finding that the arrest warrant existed at the time of Goncalves's arrest, as this factual conclusion was supported by substantial evidence. The evidence later seized from the apartment was seized pursuant to a lawful search warrant. The trial court thus did not err in denying the motion to suppress.

## II. The Complicity Instruction Was Proper.

■ At the conclusion of the trial, the jury was given the following instruction:

> You will find defendant guilty of First–Degree Robbery under this instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> A. That in this county on or about February 4, 2008, and before the finding of the indictment herein, he stole money and liquor from the Boston Beverage Depot, or Gerald Wayne Jones and/or Jennie Giguere did so with defendant, intending that Gerald Wayne Jones and/or Jennie Giguere do so, aiding either or both of them;
>
> B. That in the course of so doing and with intent to accomplish the theft, he used or threatened the immediate use of physical force upon Louis Hall, or Gerald Wayne Jones and/or Jennie Giguere did so with defendant, intending that Gerald Wayne Jones and/or Jennie Giguere do so, aiding either of them or both of them;
>
> AND
>
> C. That in the course of the foregoing either defendant or Gerald Wayne Jones and/or Jennie Giguere or any of them were armed with a handgun and/or knife.

Goncalves now claims that the first-degree robbery instruction was erroneous. Specifically, Goncalves argues that a plain reading of the instruction allowed the jury to convict Goncalves without proof of the requisite intent element beyond a reasonable doubt. He also claims that the trial court further erred when it failed to give a separate instruction defining "complicity."

This Court has addressed the requirements of a jury instruction on complicity to first-degree robbery in *Crawley v. Commonwealth*, 107 S.W.3d 197 (Ky.2003). In *Crawley*, the appellant complained that the instructions did not require the jury to find that he, as an accomplice, intended that the principal commit the robbery. *Id.* at 199. The Court found that the *Crawley* instructions were erroneous for failing to require that the appellant intend that the principal commit the robbery. As for the element of intent in first-degree robbery instructions, the Court noted in *Crawley* that the element of intent is "often" satisfied by giving a separate instruction defining complicity. *Id.* However, the *Crawley* opinion does not suggest that a separate instruction defining complicity is the *only* way to satisfy the intent element of a first-degree robbery instruction.[4]

Attacking the structure of the challenged complicity instruction, Goncalves claims that the instruction contained a "misplaced modifier" that allowed the jury to convict him without proof of his intent. This, according to Goncalves, allowed the jury to find him guilty simply if they believed that he was present at the scene of the robbery. We disagree. Despite Goncalves's claim to the contrary, a plain reading of the instruction reveals that the phrase "intending that Gerald Wayne Jones and/or Jennie Giguere do so" refers to Goncalves's intent, and not Jones and Giguere's intent. Goncalves's argument to the contrary renders the sentence almost nonsensical. Moreover, the defendant is clearly identified as the subject of the instructions, as is his act: "*he stole money and liquor* from the Boston Beverage Depot or . . . Jones and/or . . . Giguere did so with *the defendant*, intending that . . . Jones and/or . . . Giguere do so . . ." Emphasis supplied. The word "intending" can only reasonably refer to the defendant's intent.[5] *See Smith v. Commonwealth*, 370 S.W.3d 871 (Ky.2012) (robbery and burglary instructions that failed to require the jury to find that the defendant had the specific intent that his accomplices would be armed with a deadly weapon were not erroneous). Because the instructions properly required the jury to convict with proof beyond a reasonable doubt of Goncalves's intent either as principal or complicitor, his rights to due process were not violated.[6]

**4.** Commentary in the treatise *Cooper's Kentucky Instructions to Juries (Criminal)* § 10.01 (rev. 5th ed.2011) ("*Cooper's Instructions* ") suggests that a separate instruction defining complicity is unnecessary: "The instruction should describe the conduct of the defendant constituting complicity, obviating the necessity of the definition in the instructions."

**5.** These instructions mirror the exemplars provided in *Cooper's Instructions* § 10.09. While such treatises are not binding authority on this Court, we have found compliance with *Cooper's Instructions* persuasive. *See Williams v. Commonwealth*, 208 S.W.3d 881

(Ky.2006); *Foley v. Commonwealth*, 942 S.W.2d 876 (Ky.1996).

**6.** Our case law regarding the proper standard of review when reviewing alleged errors in jury instructions is inconsistent. *See Winstead v. Commonwealth*, 327 S.W.3d 386, 409 n. 55 (Ky.2010) (a recent unpublished case, *Skaggs v. Commonwealth*, 2009 WL 1830807 (Ky. June 25, 2009), declared that this Court must examine alleged errors in jury instructions using a *de novo* standard of review; however, *Ratliff v. Commonwealth*, 194 S.W.3d 258 (Ky.2006) suggests that such issues be resolved by applying abuse of discre-

As for the trial court's refusal to tender a separate instruction defining complicity, we do not find reversible error. As stated in *Crawley*, a trial court's omission of the element of intent in a first-degree complicity to robbery instruction can be cured by a separate instruction defining complicity. 107 S.W.3d at 199. Here, the trial court declined to tender a separate instruction defining complicity. However, unlike the erroneous instructions in *Crawley*, the tendered robbery instruction itself properly included the element of intent. Therefore, unlike *Crawley*, the addition of a separate instruction defining complicity was unnecessary, and no error occurred.

### III. The Prosecutor's Statements During Closing Arguments Did Not Improperly Shift the Burden of Proof and an Instruction on the Burden Was Not Required.

During the Commonwealth's closing argument, the prosecutor began to argue: "To believe this defendant not guilty, you must disbelieve ..." Goncalves's standby-counsel objected immediately, arguing that the prosecutor's statements were improper. The trial court asked the Commonwealth to rephrase the argument. The prosecutor resumed his closing argument with: "In order to believe this defendant's story, you must disbelieve all these other witnesses." Goncalves did not object to this statement or any later portion of the Commonwealth's closing argument.

Goncalves now claims that the prosecutor presented an improper argument during his closing argument by instructing the jurors on the "standard" they must apply to decide the case. He contends that this improper argument shifted the burden of proof to the defense in violation of his rights to due process. *See Butcher v.*

*Commonwealth,* 96 S.W.3d 3 (Ky.2002) ("As the presumption of innocence mandates that the burden of proof and production fall on the Commonwealth, any burden shifting to a defendant in a criminal trial would be unjust."); *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (due process protects the accused against conviction except upon proof beyond reasonable doubt of every fact necessary to constitute the crime with which he or she is charged). Further, Goncalves argues that the trial court erred when it refused to instruct the jury on the burden of proof.

When reviewing alleged prosecutorial misconduct during closing arguments, we will reverse only when the misconduct is "flagrant," or when all of the following elements are satisfied: (1) proof of defendant's guilt is not overwhelming; (2) defense counsel objected; and (3) the trial court failed to cure the error with sufficient admonishment. *Barnes v. Commonwealth,* 91 S.W.3d 564 (Ky.2002). The Court reviews the argument as a whole, while respecting the "wide latitude" granted to parties in closing arguments. *Miller v. Commonwealth,* 283 S.W.3d 690 (Ky. 2009) (*quoting Young v. Commonwealth,* 25 S.W.3d 66 (Ky.2000)).

After reviewing the closing argument as a whole, we find that the Commonwealth's argument did not improperly shift the burden of proof. Throughout the trial, Goncalves argued that the co-defendants, members of law enforcement, prosecutors, and former defense counsel conspired against him to secure his conviction. During his closing, the prosecutor called the conspiracy argument a "red herring," and offered the witnesses' testimonies as rebuttal. The prosecutor's statement was

---

tion standard of review). Nevertheless, we find no error in the tendered jury instructions

in the instant case under either *de novo* or abuse of discretion standard of review.

a permissible attempt by the Commonwealth to refute Goncalves's conspiracy defense. *Tamme v. Commonwealth*, 973 S.W.2d 13 (Ky.1998) ("A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position.")(*quoting Slaughter v. Commonwealth*, 744 S.W.2d 407 (Ky. 1987), *cert. denied*, 490 U.S. 1113, 109 S.Ct. 3174, 104 L.Ed.2d 1036 (1989)).[7]

The Commonwealth's closing argument did not constitute "flagrant" misconduct, nor can we say that the proof of the defendant's guilt was not overwhelming, as required for reversal under *Barnes*. 91 S.W.3d at 568. Both co-defendants testified against Goncalves and identified him as one of the perpetrators. After his arrest, a gun was found at Goncalves's apartment that matched the description of the gun used in the Boston Beverage robbery. A subsequent search of the apartment yielded more incriminating evidence. Willoughby, who was present at Goncalves's apartment at the time of the arrest, also testified that Goncalves was involved in the robbery. Therefore, we cannot say that an essential prong of *Barnes* is satisfied here, as proof of Goncalves's guilt was indeed overwhelming. *See Mullins v. Commonwealth*, 350 S.W.3d 434 (Ky.2011) (evidence that appellant's guilt was overwhelming bars reversal under *Barnes*).

Finally, we do not agree that the trial court erred in refusing to give jury instructions on the burden of proof. The burden of proof was sufficiently defined in the tendered presumption of innocence instruction, which required that the jury find Goncalves not guilty "unless ... satisfied from the evidence alone and beyond a reasonable doubt that he is guilty."[8] His argument that the combined effect of the prosecutor's statements and no burden of proof instruction resulted in a due process violation is unavailing.

## IV. The "Missing Evidence" Instruction Cured Any Alleged Prejudice Caused By the Commonwealth's Failure to Preserve the Computer Hard Drive.

Throughout the proceedings, Goncalves strenuously challenged the integrity of the Boston Beverage Depot surveillance camera footage, claiming it was altered by agents of the Commonwealth. He further alleged that the Commonwealth violated his rights to due process when it failed to preserve the Boston Beverage Depot's hard drive. Based on these allegations, Goncalves made a motion to dismiss the indictment with prejudice based on prosecutorial misconduct. The trial court held an evidentiary hearing where video technician Mike Van Dyke testified. At the

---

**7.** Goncalves argues that the Commonwealth's argument presented the jurors with an improper burden shifting "standard" to apply to the evidence, making his case distinguishable from *Tamme v. Commonwealth*. Perhaps this would be true if the defense had failed to object to the prosecutor's initial statement. However, the prosecutor rephrased, and remained within the bounds of proper closing argument under *Tamme* by commenting on Goncalves's tactics and the alleged falsities of his argument. 973 S.W.2d at 36.

**8.** Goncalves offers *Kentucky v. Whorton*, 441 U.S. 786, 99 S.Ct. 2088, 60 L.Ed.2d 640

(1979), arguing that the trial court's refusal to give an instruction on the burden of proof is akin to the *Whorton* court's refusal to instruct on presumption of innocence. However, the holding in *Whorton* states that a trial court's refusal to instruct on *presumption of innocence* is not in and of itself a constitutional violation; it must be evaluated in light of the totality of circumstances to determine if the defendant's due process rights were violated. *Whorton*, 441 U.S. at 789, 99 S.Ct. 2088. (Emphasis supplied). Here, the trial court did instruct on presumption of innocence.

conclusion of the hearing, the court denied the motion to dismiss and the surveillance footage was admitted into evidence over Goncalves's frequent objections. Ultimately, the trial court gave a "missing evidence" jury instruction regarding the surveillance video.[9]

Goncalves urges this Court to reverse his conviction on the grounds that the prosecution destroyed exculpatory evidence in violation of *Brady v. U.S.*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), which states that the prosecution's failure to provide all evidence material to a defendant's guilt or punishment is a due process violation. However, we need not address an alleged *Brady* violation here, as the defendant failed to prove that the Commonwealth acted in bad faith as required by *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process.") *See also Metcalf v. Commonwealth*, 158 S.W.3d 740 (Ky.2005).

Van Dyke testified about the procedure he used to copy the surveillance footage from the liquor store's hard drive, explaining that he copied clips from a specified length of time even if the motion-detecting cameras did not record images during that time frame. As a result, "time gaps" in the timestamp would occur. Van Dyke explained that the existence of "gaps" did not mean that existing footage had been removed, but rather that the motion-detecting cameras did not record *any* images during those times. In his brief, Goncalves argues that Van Dyke said there was a "fifty-fifty chance" that the video was "edited." However, Van Dyke stated that he was instructed by Detective Mattingly to copy any portions of the footage relevant to the robbery. He further testified that he did not intentionally edit the footage, nor was he directed to do so by the Commonwealth or by Detective Mattingly. In fact, Van Dyke explained that a clear shot of the robbers entering the liquor store, the absence of which Goncalves claimed was indicative of tampering, may have been inadvertently omitted during the process of copying the footage, or may never have been recorded by the computer in the first place. *See Metcalf*, 158 S.W.3d at 747 (an equipment malfunction resulting in a failure to record a potentially exculpatory conversation is not deemed to be a failure to preserve exculpatory evidence, but rather a failure to create exculpatory evidence).

■ Despite Goncalves's implication that portions of the video were erased, he failed to offer proof beyond speculation of bad faith on the part of the Commonwealth or its agents. *See McPherson v. Commonwealth*, 360 S.W.3d 207 (Ky.2012) (a claim that exculpatory evidence might have been found in a detective's preliminary notes was purely speculative and failed to establish bad faith). As such, no *Brady* violation occurred.

■ As for the Commonwealth's failure to collect and preserve the Boston Beverage Depot's hard drive as evidence, any alleged prejudice was cured by the trial court's "missing evidence" instruction. *Collins v. Commonwealth*, 951 S.W.2d 569 (Ky.1997) (a "missing evidence" instruction provided the defendant with "more than

---

9. The "missing evidence" instruction stated:

If you believe from the evidence additional surveillance video existed on the hard drive of the security equipment at Boston Beverage Depot, and that agents or employees of the Commonwealth intentionally destroyed it, you may, but are not required to, infer that the additional surveillance video would be, if available, adverse to the Commonwealth and favorable to defendant.

the process due" where the Commonwealth had merely failed to collect the evidence and any exculpatory value of the evidence was not apparent at the time it was not collected). *See also Estep v. Commonwealth,* 64 S.W.3d 805 (Ky.2002). Goncalves claims that the jury "clearly disregarded" the trial court's "missing evidence instruction" because they found him guilty. However, "it is presumed that the jury will follow instructions issued to it by the trial court." *Morgan v. Scott,* 291 S.W.3d 622 (Ky.2009) (*citing Johnson v. Commonwealth,* 105 S.W.3d 430, 436 (Ky. 2003); *United States v. Davis,* 306 F.3d 398, 416 (6th Cir.2002)). Goncalves argues that the surveillance video's "missing footage" would have "presumptively ... exonerated" him, yet he offers no proof on appeal to rebut the presumption that the jury followed the trial court's "missing evidence" instruction.

In sum, Goncalves could not prove that the surveillance footage was edited by the Commonwealth or by its agents, and therefore the trial court did not err when it allowed the surveillance footage into evidence. Any alleged prejudice caused by the Commonwealth's failure to preserve the liquor store's computer hard drive as evidence was cured by the trial court's "missing evidence instruction." Finally, the jury is presumed to have followed the "missing evidence" instruction, and Goncalves has failed to offer proof to the contrary.

### V. The Trial Court Did Not Err When it Refused to Compel the Prosecutor's Testimony.

■ Next, Goncalves argues that the trial court erred in refusing to allow him to examine the prosecutor regarding the alleged destruction of the surveillance video evidence.[10] Specifically, Goncalves claims that the prosecutor's testimony was necessary to establish bad faith under *Arizona v. Youngblood,* 488 U.S. at 57, 109 S.Ct. 333. However, we have not held that a prosecutor's testimony is required to establish bad faith under *Youngblood.* In fact, we have held that generally, a prosecuting attorney should not testify as a witness in trial. *Moss v. Commonwealth,* 949 S.W.2d 579 (Ky.1997). Such a practice is permissible only when the attorney's testimony is absolutely necessary. *Brown v. Commonwealth,* 512 S.W.2d 509 (Ky. 1974) ("If other testimony is unavailable or there is the element of surprise ... we are of the opinion that the necessity of circumstances and the ends of justice outweigh a general disapproval of the prosecuting attorney's testifying as a witness."). Further, this Court has permitted a prosecuting attorney to testify to the uncontested circumstances under which evidence was discovered. *See Moss,* 949 S.W.2d at 582 (prosecutor was required to testify when he sought to introduce evidence that he, along with the defense attorney, discovered during a search of the defendant's clothing). The *Moss* court relied on Supreme Court Rule ("SCR") 3.130 and Rule 3.7(a)(1) of the Rules of Professional Conduct which permits such testimony when "the testimony relates to an uncontested issue."

■ In the instant case, the prosecutor's testimony was unnecessary. Goncalves concedes that everyone who was questioned about the alleged alteration of the evidence denied doing so. Unlike the

---

10. As to the preservation of this issue, Goncalves directs the Court to an earlier preservation argument presented in his brief. This tactic is in violation of CR 76.12, which requires that briefs to the Supreme Court contain "ample supportive references to the record." Not only is Goncalves's reference to an earlier preservation argument improper, it is also insufficient proof of preservation of this issue.

prosecutor in *Moss* who discovered evidence, the prosecutor here was not directly or indirectly involved in retrieving or viewing the surveillance footage on the morning of the robbery. Goncalves suggests that the footage "appears" edited, claiming that the Commonwealth may have erased portions of the tape once it was in its custody. Despite Goncalves's insistence that the prosecutor should have been required to confirm or deny his office's involvement in allegedly tampering with the footage,[11] Van Dyke's testimony sufficiently addressed the "choppy" appearance of the film. Additionally, the proper preservation of evidence was a matter in controversy, at least from Goncalves's viewpoint. Therefore, the facts of this case are distinguishable from *Moss*, where the substance of the prosecutor's trial testimony was uncontroverted.

Goncalves was not denied his right to a fair trial when the trial court refused to allow him to question the prosecutor before the jury. The prosecutor's testimony regarding a contested issue would have violated our rules of professional responsibility. Goncalves examined the parties who were present when the footage was retrieved, and no one testified to being asked to alter or destroy the evidence. *But cf. Commonwealth v. Deloney*, 20 S.W.3d 471 (Ky.2000) (testimony of prosecutor required where there was an allegation that the Commonwealth encouraged a witness to testify in such a way to cause a mistrial). The trial court's decision to not allow Goncalves to examine the prosecutor at trial was justified.

## VI. Goncalves was not denied his right to a speedy trial.

 Goncalves's right to a speedy trial was not violated by the two-year period

from his arrest to his third trial. The right to a speedy trial is guaranteed by both the Sixth Amendment of the United States Constitution and Section 11 of the Kentucky Constitution. When a speedy trial violation is raised on appeal, a reviewing court must consider four factors to determine if a violation occurred: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *Bratcher v. Commonwealth*, 151 S.W.3d 332 (Ky.2004). We must balance these factors by first considering each factor individually and then weighing them together. *Smith v. Commonwealth*, 361 S.W.3d 908 (Ky.2012).

Before turning to the *Barker* analysis, we note again that this case was tried three times. Goncalves was arrested on February 5, 2008, and was indicted by a Nelson County Grand jury on February 6, 2008. His first trial began on March 23, 2009. A mistrial was declared on March 25, 2009, when the jury was unable to reach a unanimous verdict. A second trial began on July 22, 2009, and a mistrial was declared in that trial on July 29, 2009 when the jury became deadlocked. His third trial began on February 8, 2010. Urging the Court to evaluate only the period of time between Goncalves's second mistrial and his third trial for speedy trial violation, the Commonwealth cites our decisions in *Tamme*, 973 S.W.2d at 13 and *Ferguson v. Commonwealth*, 401 S.W.2d 225 (Ky. 1965). However, *Tamme* and *Ferguson* are distinguishable from the instant case, as those speedy trial challenges arose fol-

---

**11.** The prosecutor, in pretrial proceedings, denied that the surveillance video had been tampered with, by anyone in his office or otherwise. These were representations made to the Court as an officer of the court.

lowing the reversal of a conviction and a RCr 11.42 action, respectively. To that end, we are unconvinced that our decisions in *Tamme* and *Ferguson* control our course here, where mistrials were declared when both the first and second juries deadlocked.

■ Some states have adopted the position that the speedy trial "clock" starts anew following a mistrial.[12] Our Kentucky Rules of Criminal Procedure do not speak directly to the effect of a mistrial on a defendant's right to a speedy trial, and our courts have approached the question in different ways. For example, the Court of Appeals has applied the speedy trial analysis to the time period between an appellant's mistrial and retrial. *Johnson v. Commonwealth*, 709 S.W.2d 838 (Ky.App. 1986). More recently, however, this Court, in unpublished opinions, has measured the pertinent period of delay from the time of arrest to the time of the final trial, treating mistrials as reasons for delay to be considered in the speedy trial calculus. *See Harwell v. Commonwealth*, No. 2009–SC–000333–MR, 2011 WL 1103112 (Ky. 2011); *Odom v. Commonwealth*, No. 2008–SC–000272–MR, 2010 WL 1005958 (Ky. 2010); *Ali v. Commonwealth*, No. 2005–SC–000609–MR, 2007 WL 1159953 (Ky. 2007). The United States Fourth Circuit Court of Appeals has undertaken a similar method to measure delay in the context of a speedy trial violation in a case with multiple mistrials. *U.S. v. Hall*, 551 F.3d 257 (4th Cir.2009). We conclude that this latter approach is appropriate because the four-factor *Barker* analysis allow for full and proper consideration of intervening mistrials under the second factor, the reasons for delay.

### a. The delay between arrest and third trial was presumptively prejudicial.

■ Only presumptively prejudicial delays will trigger the speedy trial inquiry, and therefore we must determine the length of delay as a threshold matter. *Dunaway v. Commonwealth*, 60 S.W.3d 563 (Ky.2001) (a defendant's rights to a speedy trial are not violated unless the delay is presumptively prejudicial). Generally, we measure the length of delay as "the time between the earlier of the arrest or the indictment and the time the trial begins." *Smith*, 361 S.W.3d at 914 (*quoting Dunaway*, 60 S.W.3d at 569). In addition to the length of time associated with the delay, the nature and complexity of the case must also be analyzed in order to determine if the delay is presumptively prejudicial. *Cain v. Smith*, 686 F.2d 374 (6th Cir.1982); *see also Barker*, 407 U.S. at 530, 92 S.Ct. 2182 ("The delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge."). Goncalves was charged with one count of first-degree robbery and one count of PFO. We consider these charges to be serious in nature and moderately complex. *Dunaway*, 60 S.W.3d at 563.

■ This Court has generally considered delays of over one year to be presumptively prejudicial. *See e.g., Bratcher v. Commonwealth*, 151 S.W.3d 332 (Ky. 2004) (finding an eighteen months' delay in a murder trial presumptively prejudicial, while ultimately finding no speedy trial violation). We conclude, therefore, that the two-year period between the arrest and third trial is presumptively prejudicial,

---

**12.** *See Scott v. State,* 829 So.2d 688 (Miss.Ct. App.2002); *State ex rel. Brumfield v. Perry Circuit Court,* 426 N.E.2d 692 (Ind.1981); *Icgoren v. State,* 103 Md.App. 407, 653 A.2d 972 (1995); *People v. Thimmes,* 643 P.2d 778 (Colo.App.1981); *State v. Strong,* 258 Mont. 48, 851 P.2d 415, 416 (1993); *Odum v. State,* 311 Ark. 576, 845 S.W.2d 524 (1993).

and we will proceed to balance the remaining three *Barker* factors.

### b. The reasons for delay do not weigh in Goncalves's favor.

The second *Barker* factor, the reasons for delay, does not weigh in Goncalves's favor, as a majority of the pretrial delays were caused by Goncalves, and those caused by the Commonwealth were for valid reasons. Overlaying all of this is the fact that Goncalves's case had to be tried three times before a verdict could be reached.

When balancing the reasons for delay to determine if a speedy trial violation has occurred, a reviewing court must first identify the type of delay in order to assign the appropriate weight. *Barker*, 407 U.S. at 531, 92 S.Ct. 2182. A deliberate attempt by the Commonwealth to cause delay in order to hamper the defense will be accorded the heaviest weight in this analysis. *Id.* Neutral reasons for delay, such as negligence or an overcrowded docket, will be weighed less heavily against the Commonwealth, but will nonetheless tip in the defendant's favor. *Id.* Finally, a valid reason for delay, such as a missing witness, will not be weighed against the Commonwealth, as valid reasons for delay are appropriately justified. *Id.* Although the *Barker* court did not identify a mistrial caused by a hung jury as a valid reason for delay we believe that it is a self-evident valid reason for delay.

To reiterate, Goncalves was arrested on February 5, 2008 and indicted the following day. The first trial, originally scheduled to begin on July 8, 2008, ultimately commenced on March 23, 2009. His second trial began four months later on June 22, 2009, and his final trial commenced on February 8, 2010. Upon our own review of the trial court's record, we have gleaned that delays arose, generally, from Goncalves's own motions and pretrial demands, the March 2009 suppression hearing, problems related to Goncalves's legal representation, and, again, from the necessity of completing three full trials before a verdict could be reached.

Prior to the start of his first trial, Goncalves filed approximately thirty-three motions, including a motion to suppress, a motion for an emergency evidentiary hearing, and a motion for a continuance of the original trial date. In the four months between the first mistrial and the second trial, Goncalves filed approximately eighteen motions with the trial court, and another sixteen motions in the seven months between the second mistrial and third trial. He filed a number of *ex parte* motions, which were often mailed directly to the trial court judge instead of being properly filed with the clerk of the court. In addition to responding to each motion in turn, the trial court was forced to instruct Goncalves on proper compliance with local rules in filing *ex parte* motions.[13] Clearly, delays caused by the defendant cannot be weighed against the Commonwealth in our analysis. *Crayton v. Commonwealth,* 846 S.W.2d 684 (Ky.1992) (no speedy trial violation where the defendant engaged in "acts wholly inconsistent with any contention that [defendant] desired a speedy trial.").

A second major source of delay stemmed from the suppression hearing which began on March 11, 2009 and was continued on March 23. The trial court granted continuances to the suppression hearing, specifically relating to preparing enhanced video surveillance footage, at the agreement of both the Commonwealth and Goncalves. This particular delay, there-

---

13. Goncalves was represented or assisted by counsel during all stages of proceedings.

fore, will not be weighed for or against Goncalves. *See Smith,* 361 S.W.3d at 908 (when appellant equally responsible for a delay it shall not weigh for or against his favor).

A third source of delay can be attributed to a variety of issues related to Goncalves's representation. Goncalves moved the trial court to relieve his first public defender, Mr. Woolridge. In the same motion, Goncalves requested that he be given leave to proceed *pro se.* In addition to his motion to remove Mr. Woolridge, Goncalves filed an ineffective assistance of counsel claim with the trial court. The trial court conducted a *Faretta* hearing, and appointed a second public defender to serve as Goncalves's hybrid counsel. Goncalves also raised complaints before the trial court about his fourth public defender, Ms. Pollock. This complaint had to be resolved during motion hour. Prior to that, conflict of interest forced his second and third public defenders to withdraw. These delays, again, are not attributable to the Commonwealth.

Goncalves cites Detective Mattingly's absence for training and again for surgery as causes of delay that should weigh heavily against the Commonwealth. Notably, Goncalves does not identify when in the two-year period these absences occurred, although our review of the record reflects that the absences were prior to the suppression hearing. Regardless, the *Barker* court specifically classified delay caused by a missing witness as a neutral reason for delay that will not weigh against the government. *Barker,* 407 U.S. at 531, 92 S.Ct. 2182.

Finally, an overarching reason for a two-year delay between the indictment and the trial that produced the conviction was the intervention of two mistrials caused by deadlocked juries. The Commonwealth cannot be held responsible for the fact that a jury cannot reach a verdict. Indeed, the Commonwealth fulfilled its obligation each time it prepared the case and presented it to the jury so this cause for delay actually weigh in the Commonwealth's favor.

 On balance, the delays do not weigh at all in Goncalves's favor. The delays caused by Detective Mattingly's absences were justified, and we find no deliberate attempts to delay the trial on the part of the Commonwealth. Indeed, the Commonwealth brought the case to trial three times in the two-year period. Further, many delays throughout the two-year period were caused by Goncalves's own pretrial maneuvering, as well as his complaints about counsel and requests for new representation. We conclude that the reasons for delay were thus fully justified.[14]

---

14. As for the periods of time prior to his second and third trials, we cannot say that a four-month or seven-month delay is presumptively prejudicial to warrant a *Barker* inquiry in the first place. *See, e.g., Gerlaugh v. Commonwealth,* 156 S.W.3d 747 (Ky.2005) (a nine-month delay in a robbery trial is not presumptively prejudicial). However, assuming *arguendo* that the. seven-month delay was presumptively prejudicial, we cannot say that the reason for delay weighs in Goncalves's favor. The second mistrial was declared on July 29, 2010. The parties were scheduled to return to court to set pretrial and trial dates on September 3, 2010. However, Goncalves's hybrid counsel, Ms. Pollock, was un-der subpoena for another case and was unable to attend. The pretrial conference was continued to September 11, 2010. At that conference, the trial date was set for February 8, 2010. Goncalves did not object to this date, and the trial commenced as scheduled. Therefore, the only delay prior to the third trial arose when hybrid counsel was unable to attend a pretrial conference. The reason for the delay cannot be heavily weighed against the Commonwealth, as Ms. Pollock's absence was beyond its control, and the court's selection of trial dates must be considered as a neutral reason for delay. *Barker,* 407 U.S. at

#### c. Goncalves did assert his right to a speedy trial.

 As for the third *Barker* element, Goncalves did assert his right to a speedy trial in writing on June 26, 2008. It is the defendant's responsibility to assert his right to a speedy trial. *Barker,* 407 U.S. at 531, 92 S.Ct. 2182. This factor weighs in Goncalves's favor, as he asserted his right to a speedy trial on various occasions, both verbally and in writing. *Id.* ("The more serious the deprivation, the more likely a defendant is to complain."); *see also Miller v. Commonwealth,* 283 S.W.3d 690 (Ky.2009).

#### d. Goncalves was not prejudiced by the delay.

 Goncalves suffered no prejudice by the delay. Under the fourth prong of *Barker,* we must analyze any alleged prejudice by considering the interests that the right to a speedy trial is designed to protect: (1) to prevent oppressive pretrial incarceration; (2) to minimize the anxiety and concern of the accused; (3) to limit the possibility that the defense will be impaired. 407 U.S. at 532, 92 S.Ct. 2182.

 Goncalves maintains that all three of the above-mentioned interests were violated. We disagree. First, Goncalves had a lengthy criminal history with no ties to the state of Kentucky; thus, his incarceration without bond is not unexpected. Though we agree two years is a long period of incarceration, we must note yet again that Goncalves received three trials during that two-year period. While a long delay creates "presumptive prejudice" sufficient to compel a full *Barker* inquiry, it does not necessarily prove that the defendant suffered actual prejudice. *Bratcher,* 151 S.W.3d at 345. Further, his claim of oppressive incarceration is offered without any proof of trauma. *See id.,* ("Conclusory claims about the trauma of incarceration, without proof of such trauma, and the possibility of an impaired defense are not sufficient to show prejudice."). Second, Goncalves's complaint that he suffered anxiety does not satisfy the fourth *Barker* prong. In his brief, Goncalves claims, in particular, that he suffered "well-documented anxiety from *lack of effective representation, investigation, transcripts and legal access.*" (Emphasis supplied). By his own admission, Goncalves attributes his anxiety to his legal representation and alleged lack of access to legal materials. In fact, Goncalves presented a separate claim relating to his access to legal materials in this very appeal, arguing that he should have been granted *more time* by the trial court to access materials. Finally, his assertion that his defense was impaired due to the "destruction of evidence" is simply tied to his conspiracy theory that the Commonwealth and its agents intentionally destroyed evidence. We have already found that claim to be without merit. *See, supra,* at pp. 195–97.

 The two-year period from Goncalves's arrest to the third trial was presumptively prejudicial, and having asserted his right to a speedy trial early on in the proceedings, Goncalves was clearly concerned about bringing his case to trial. However, a great number of delays, indeed most, were of Goncalves's own creation (*e.g.,* sixty-seven pretrial motions and conflicts with four different attorneys), and the Commonwealth did not attempt to deliberately delay the trial, but instead brought the case to a jury trial three times in two years. Further, Goncalves was not prejudiced by the delay. Balancing all four *Barker* factors, we conclude that Gon-

531, 92 S.Ct. 2182; *Dunaway v. Commonwealth,* 60 S.W.3d 563 (Ky.2001).

calves was not denied his right to a speedy trial.

## VII. The Trial Court Did Not Abuse its Discretion When it Refused to Allow the Use of Video–Recorded Testimony to Impeach Witnesses.

Next, Goncalves challenges the trial court's refusal to allow him to use video-recorded testimony to impeach witnesses. During the direct examination of Boston Beverage manager Todd Buster, Goncalves asked if the surveillance footage was stored on the computer hard drive for "one year." When Buster responded that he "couldn't recall," Goncalves attempted to impeach Buster by reciting portions of his testimony from the second trial. Buster stated that he "wasn't sure about the time frame" and that he "didn't recall." Goncalves then asked the trial court to allow him to replay Buster's video-recorded testimony from the second trial. The trial court denied his request, instead allowing Goncalves to continue reciting portions of testimony from his own transcript. Goncalves argued that his own handwritten transcript would not appear as reliable to the jury as the video-recorded statements. The trial court responded that he would be permitted to use the video-recorded statements if the Commonwealth challenged the veracity of his transcript. Later, Goncalves attempted to impeach David Willoughby with video-recorded statements, and was again denied by the trial court.

 Now, Goncalves contends that the trial court erred in prohibiting the use of video-recorded testimony to impeach Buster and Willoughby in violation of his Sixth Amendment right to confrontation. *Holt v. Commonwealth,* 250 S.W.3d 647 (Ky.2008) ("The right to impeach a witness to show bias or prejudice is fundamental to a fair trial.") (*citing Williams v. Commonwealth,* 569 S.W.2d 139 (Ky.1978)). "A

proper and important function of the constitutionally protected right of cross-examination" is "the exposure of a witness's motivation in testifying." *Montgomery v. Commonwealth,* 320 S.W.3d 28 (Ky.2010) (*citing Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). We review a trial court's limitation on cross-examination for abuse of discretion. *Nunn v. Commonwealth,* 896 S.W.2d 911 (Ky.1995).

 The defendant's right to cross-examine a witness is not without limits. This Court has recognized that there is no constitutional guarantee to engage in cross-examination in whatever manner and extent that the defense so desires. *Davenport v. Commonwealth,* 177 S.W.3d 763, 768 (Ky.2005). Trial courts retain "wide latitude" in imposing "reasonable limitations" on cross-examinations, and act well within their purview in limiting examinations that are harassing, confusing, repetitive, or only marginally relevant. *Star v. Commonwealth,* 313 S.W.3d 30 (Ky.2010). Therefore, "so long as a reasonably complete picture of the witness's veracity, bias and motivation is developed, the judge enjoys power and discretion to set appropriate boundaries." *Davenport,* 177 S.W.3d at 768 (*quoting Commonwealth v. Maddox,* 955 S.W.2d 718 (Ky.1997)).

 Goncalves does not claim that the trial court's prohibition in some way excluded evidence, but rather that he was unable to conduct his cross-examination in the manner in which he desired. This is not, in our view, an unconstitutional limitation on cross-examination. Goncalves was permitted to use previous testimony to impeach the witnesses by using a transcript of the video-recorded testimony. The Commonwealth never contested the veracity of that transcript. In fact, neither Buster nor Willoughby denied making the statements after they were read in

court.[15] Therefore, a "complete picture" of the witnesses' veracity was adequately developed by Goncalves's examination.

■ As stated by the Supreme Court in *Van Arsdall*, a defendant may claim a constitutional violation of his or her right to confrontation where "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination." 475 U.S. at 680, 106 S.Ct. 1431. We cannot say that a video-recorded testimony with content identical to that contained in an uncontested transcript would significantly impact the jury's impression of the witness's credibility. Here, the trial court's refusal to allow Goncalves to replay video-recorded testimony when a transcript of that testimony was available constituted a reasonable limitation on cross-examination, and was not an abuse of discretion.[16]

### VIII. Goncalves Had Adequate Access to the Trial Record.

■ Goncalves claims that his due process rights were violated when he was allegedly denied pretrial access to the trial record. Specifically, Goncalves argues that he had a constitutional right as a *pro se* litigant to access trial transcripts, a DVD player, equipment to convert CDs to DVDs, as well as greater access to the

Hardin County Detention Center's law library computer. Goncalves is correct that he had a due process right to access trial transcripts. *Britt v. North Carolina*, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971). However, we find no such violation here, as Goncalves *was* provided a trial record. In his brief, Goncalves admits that he had access to CD records initially, and was later given DVD records by the court. After the second mistrial, Goncalves was permitted access to the jail's law library five days per week for four hours per day, where he had access to a DVD player.[17]

Citing *Greene v. Brigano*, 123 F.3d 917 (6th Cir.1997), Goncalves claims that he was denied the "basic tools" of advocacy when the trial court refused to grant him access to "DVDs or CDs and sufficient hours to review them on an appropriate player." This argument is without merit. Goncalves *was* provided access to both DVDs and CDs, appropriate viewing devices, and sufficient time to review these records. Goncalves has failed to demonstrate prejudice resulting from his access to the video trial record. *See Wheeler v. Commonwealth*, 121 S.W.3d 173 (Ky.2003) (the use of a video record did not deny a party due process of the law although no additional type-written record was provided). Having access to the trial record and appropriate viewing devices, Goncalves did

---

**15.** Specifically, Buster stated "if I said it, I said it." Willoughby similarly conceded to making the statement, and agreed with stand-by-counsel that he would not deny the statement after it was read in court.

**16.** Even if we were convinced that the trial court's refusal to allow Goncalves's use of the video was error, such error would be harmless under our case law. *See Holt*, 250 S.W.3d at 647 (harmless error when evidence of a witness's participation in pretrial diversion program excluded by the trial court); *Dennis v. Commonwealth*, 306 S.W.3d 466 (Ky.2010) (defendant's right to confrontation

not violated when trial court excluded alleged victim's prior false accusations); *Star*, 313 S.W.3d at 30 (trial court's refusal to allow defendant to cross-examine a witness about pending criminal charges was harmless error). In Goncalves's case, no evidence was excluded by the trial court's ruling.

**17.** Goncalves's access was later limited by order of the trial court to three days per week for three hours per day when he failed to comply with the jail's rules regarding access to the library.

not suffer a violation of this due process rights.

## IX. Goncalves Was Not Denied Adequate Access To Legal Materials.

 Next, Goncalves claims that he was denied adequate access to a law library, resulting in a violation of his due process rights. We disagree. Citing *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) and *Bribiesca v. Galaza*, 215 F.3d 1015 (9th Cir.2000), Goncalves asserts that he, as a *pro se* pretrial detainee, had a right to reasonable access to a law library. However, the Supreme Court has held that "*Faretta* says nothing about any specific legal aid that the State owes a *pro se* criminal defendant." *Kane v. Garcia Espitia*, 546 U.S. 9, 126 S.Ct. 407, 163 L.Ed.2d 10 (2005). We need not explore this question further, as it is clear from the record that Goncalves was not denied access to the law library. After receiving a letter from the Hardin County Jailer informing the court of Goncalves's misconduct relating to his library privileges, the trial court ordered that Goncalves's access to the law library be limited to three days per week for three hours per day. Prior to this order, Goncalves was permitted to access the law library five days per week for four hours per day. We cannot say that Goncalves's access to the law library constituted a violation of his due process rights.

## X. The Trial Court's Denial of Goncalves's Motion For a Directed Verdict Based on Unreliability of Witnesses Was Not Palpable Error.

 Now we must address Goncalves's claim that the trial court erred when it denied his motion for a directed verdict, allowing the jury to render a conviction based on insufficient evidence. Goncalves argues that his motion should have been granted because three of the Commonwealth's witnesses were inherently unreliable, and therefore their testimonies lacked credibility. This issue is unpreserved, and therefore we proceed with palpable error review.[18] We will reverse a conviction for palpable error only when "manifest injustice has resulted from the error." RCr 10.26. This requires "probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth*, 207 S.W.3d 1 (Ky.2006).

Goncalves alleges that Mattingly, Giguere, and Willoughby's testimonies were "inherently" unreliable. He claims that these three witnesses were motivated to testify against him; specifically, that Mattingly sought to secure a conviction for professional gain, Giguere testified against Goncalves in order to preserve her plea agreement, while Willoughby wished to shift the blame from himself. Also, Goncalves claims that Giguere demonstrated a lack of credibility when she repeatedly testified to wearing a jacket with "a broad stripe" during the robbery. A jacket matching that description was found in Jones's trunk. Goncalves now contends that the witnesses' unreliable testimony rendered the proof supporting his conviction insufficient. To support this argument, Goncalves relies on a case from the Illinois Supreme Court, wherein the defendant's conviction was reversed when a single witness's testimony was determined to be so unreliable that "no reasonable trier

---

**18.** At the close of the Commonwealth's case in chief, Goncalves's standby-counsel moved for a directed verdict based on the Commonwealth's failure to establish each element of the first-degree robbery charge. This general motion for a directed verdict did not properly preserve the witness reliability issue for appellate review. *Pate v. Commonwealth*, 134 S.W.3d 593 (Ky.2004); *Daniel v. Commonwealth*, 905 S.W.2d 76 (Ky.1995).

of fact could have found [the witness's] testimony credible." *People v. Smith*, 185 Ill.2d 532, 236 Ill.Dec. 779, 708 N.E.2d 365 (1999).

 The trial court clearly did not err in denying Goncalves's motion. In ruling on a motion for a directed verdict, the trial court "must assume that evidence for the Commonwealth is true, but reserving to jury questions as to the credibility and weight to be given to such testimony." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991).[19] Any inconsistencies in the witnesses' statements go to the weight of those testimonies. *See Gray. v. Commonwealth*, 203 S.W.3d 679 (Ky.2006) (inconsistencies in the testimonies of Commonwealth's witnesses did not entitle defendant to a directed verdict when testimonies were properly introduced). Mattingly, Giguere, and Willoughby did not testify to events that were "physically impossible or improbable," as to render those testimonies devoid of any probative value. *Coney Island Co., Inc. v. Brown*, 290 Ky. 750, 162 S.W.2d 785 (1942); *see also Potts v. Commonwealth*, 172 S.W.3d 345 (Ky.2005). Rather, Goncalves identifies their respective motives in testifying as the source of their "inherent reliability." A witness's personal motive in testifying is a question of credibility within the sole province of the jury. *See Potts*, 172 S.W.3d at 349 (a witness's motive to fabricate testimony is an "ordinary matter of credibility, which is within the exclusive province of the jury.") (*quoting Commonwealth v. Smith*, 5 S.W.3d 126, (Ky.1999)).

In sum, the trial court did not commit any error when it denied Goncalves's mo-

tion for a directed verdict. The credibility of the witnesses was an issue for the jury, not the trial court, to resolve. Convinced that the trial court properly denied Goncalves's motion for a directed verdict, we find no error, much less palpable error.

## XI. Goncalves Had Sufficient Access to the Trial Record to Prepare the Appellate Brief.

Next, Goncalves alleges that his constitutional rights under the Sixth and Fourteenth Amendment of the United States Constitution and Section 115 of the Kentucky Constitution were violated when the Commonwealth failed to provide his appellate counsel with a complete trial record until the day of his filing deadline. Goncalves urges this Court to reverse his conviction and dismiss his case with prejudice in order to "send a message" to the Commonwealth to encourage prompt compliance with requests for trial records.

Goncalves was convicted and sentenced on February 12, 2010. Following a request in late March, the Nelson Circuit Court Clerk provided copies of the trial record to this Court, which was filed on April 19, 2010. The record included ten volumes of trial record, sixteen original CDs, and thirteen copied CDs of trial proceedings. The Department of Public Advocacy ("DPA") checked out the record on April 26, 2010, and assigned Goncalves's appellate counsel three days later. After reviewing the record, counsel discovered that many segments of the trial were missing. Nearly two months later on June 22, 2010, Goncalves's counsel filed a motion with this Court requesting supplementation of the record, as well as a filing exten-

---

19. Goncalves urges this Court to reconsider the rule set forth in *Benham*, which states that a reviewing court will not "reevaluate the proof because its only function is to consider the decision of the trial judge in light of the proof presented." 816 S.W.2d at 187. How-

ever, our recent decisions reaffirm *Benham's* standard placing witness credibility firmly within the jury's realm of responsibility. *See Smith v. Commonwealth*, 361 S.W.3d 908 (Ky. 2012); *Jones v. Commonwealth*, 331 S.W.3d 249 (Ky.2011).

sion. After discovering additional missing segments of the record, Goncalves's counsel filed a second motion to supplement on July 13, 2010. The Commonwealth responded to Goncalves's first (June 22) and second (July 13) motion to supplement on July 14 and 15, respectively. The Court granted the June 22 motion and ordered supplementation of the record on July 16, 2010. The Court received the ordered supplementation on August 2, 2010 and immediately sent the record to the Administrative Office of the Courts ("AOC") for duplication. The DPA checked out the newly supplemented record on August 20, 2010. Two months later on October 27, 2010, Goncalves's counsel made a third motion for supplementation after discovering that a critical piece of the suppression hearing was missing. At that time, Goncalves requested another deadline extension to file his brief, which was granted on December 9, 2010, extending his deadline to perfect the appeal to January 10, 2011. The Nelson Circuit Court provided yet another copy of the requested CDs, which was filed and checked out by the DPA on December 29, 2010. However, Goncalves was forced to file a fourth motion to supplement the record on January 4, 2011, when portions of the previously tendered CDs were discovered missing or defective. The next day, the Court ordered the trial court to provide a certified copy of the missing proceedings. The missing portions were finally filed on January 10, 2011, the deadline to perfect the appeal. Goncalves's brief was filed that same day.

Now, Goncalves claims that the delay caused by the trial court's failure to timely provide a complete record violated his constitutional rights, in that his ability to review the record and craft a complete argument was hindered. While it is true that the delay certainly foreclosed Gon-

calves's ability to timely review the entire record before filing his brief, he was not without a remedy. Therefore, we do not find that his constitutional rights were violated.

Goncalves contends that he had no time to review the belatedly tendered record in order to "use it in this appeal." Despite the fact that the record of the suppression hearing was filed on the filing deadline for his brief, Goncalves could have supplemented any underdeveloped arguments in his reply brief. *See Hollingsworth v. Hollingsworth*, 798 S.W.2d 145 (Ky.App.1990) ("A reply brief may be used to both supplement appellant's original brief and to correct a procedural defect related to CR 76.12."). The Commonwealth's brief was filed on May 2, 2012, and the DPA checked out the record on May 8, 2012, for the afternoon only. A motion for an extension of time to file the reply brief was filed by Goncalves's counsel on May 10, 2012. The DPA checked out the complete record once again on May 15, 2012. The Court granted the motion for a filing extension, and the reply brief was filed pursuant to a Court order on May 25, 2010. Between the time that the record was first checked out on May 8, and the filing of the reply brief on May 25, Goncalves counsel did not move for a supplementation of the record. This indicates that the record was complete at that time, and Goncalves does not suggest otherwise now. Goncalves had an opportunity to address any extant deficiencies or omissions by supplementing his original brief with his reply brief.

Goncalves also failed to avail himself to CR 75.13, which allows an appellant to prepare a narrative statement "as a supplement to or in lieu of an insufficient electronic recording." Goncalves's appellate counsel was aware of the poor quality

of the recordings.[20] Further, CR 75.13 allows an appellant's narrative statement to be based on "the best available means, including his/her own recollection." Our own review of the record reveals that Goncalves himself, having proceeded *pro se* through three trials, maintained fastidious notes and transcripts of all proceedings. Given counsel's advance notice of potential issues with the CDs, as well as Goncalves's tendency to produce his own meticulous transcripts of proceedings, this case appears to present a situation where CR 75.13 could have been usefully applied. *See Chestnut v. Commonwealth,* 250 S.W.3d 288 (Ky.2008) (an appellant's failure to avail himself of CR 75.13 when a video record was incomplete as to a suppression hearing precluded the Court from accepting the party's claim that the trial court failed to render findings of fact); *see also Davis v. Commonwealth,* 795 S.W.2d 942 (Ky.1990).

Goncalves argues that we should reverse his convictions in order to "send a message" to the Commonwealth "that it must ensure provision of existing record" when it has been requested for an appeal. Goncalves also claims that the Commonwealth "failed to meet its burden" when it failed to provide a complete record that, Goncalves contends, was in the Commonwealth's possession. However, we have held that the burden of supplying the record to the Court falls on the appellant. *Chestnut,* 250 S.W.3d at 303–04. Further, the Commonwealth encountered problems with the functionality of the CDs and was similarly forced to file a motion for supplementation in preparing its own brief in this

matter. Therefore, Goncalves's contention that the Commonwealth possessed a complete, viable record "at all times" and "ignored" his *pro se* designation is without merit. Reversal is unwarranted on these grounds.

## XII. The Fifty–Page Limit For Goncalves's Briefs Does Not Violate Due Process.

Goncalves challenges this Court's denial of his motion requesting permission to file a brief in excess of fifty pages, as well as our denial of his motion requesting leave to file a *pro se* supplemental briefing. He now argues his constitutional right to due process and equal protection under the Sixth and Fourteenth Amendments of the United States Constitution, as well as his right to appeal as guaranteed by Section 115 of the Kentucky Constitution, was violated. We disagree.

CR 76.12(4)(b)(ii) imposes a fifty-page limit on briefs submitted to this Court. We have held that this page limit does not impair a party's right to a "full and fair hearing of all the issues," nor does it result in ineffective assistance of counsel, as there is no constitutional right to a specific number of pages in an appellate brief. *Sanborn v. Commonwealth,* 975 S.W.2d 905 (Ky.1998) (*overruled on other grounds by Leonard v. Commonwealth,* 279 S.W.3d 151 (Ky.2009)). There is no due process violation when an appellate brief page limit is imposed. *Bowling v. Commonwealth,* 981 S.W.2d 545 (Ky.1998). While we agree that the record in this case is extensive, we nevertheless believe that

**20.** In a footnote of the brief, Goncalves discusses the poor quality of the trial court's recording system, specifically complaining of incidents during the February 8–9, 2010 proceedings. It is worth noting that these portions of the CD record were available to Goncalves on April 26, 2010, as it does not appear that these proceedings were the subject of any of the motions for supplementation. We mention this only to illustrate the fact that counsel was conceivably on notice of potential issues with the CDs well in advance of the filing deadline.

the page limit afforded Goncalves adequate opportunity to address all meritorious issues. *See Parker v. Commonwealth,* 291 S.W.3d 647 (Ky.2009).

As for the denial of the motion requesting leave to file *pro se* supplemental briefing, Goncalves has failed to present an argument with references to the record, and we decline to address this claim *sua sponte. See* CR 76.12(4)(c)(v).

## XIII. The Trial Court Erred in Requiring a Review of Goncalves's Ability To Pay Costs and Fees Upon His Release

■■■■ Finally, Goncalves argues that the trial court erred when it imposed a $200 public defender fee and $180 in court costs in this case because he was an indigent defendant. The Commonwealth concedes that this was error because "[Goncalves] was indigent throughout the entire proceedings and continuously assigned a public defender." However, as held by this Court in *Maynes v. Commonwealth,* 361 S.W.3d 922 (Ky.2012), a defendant's indigent status does not automatically prohibit a trial court from imposing court costs if the trial court determines that the defendant can afford to pay such costs. Also, a trial court may require an indigent defendant to contribute to his defense if he is able to make such payments. 361 S.W.3d at 928. In reaching this conclusion, the *Maynes* Court examined KRS 23A.205, which provides that a person convicted of a crime in Circuit Court shall pay court costs of $100.00. KRS 23A.205 also allows the court to waive such costs for "poor persons." As for legal representation, KRS 31.110, provides that "needy persons" facing serious criminal charges are entitled to representation by a public advocate. *Id.* at 925. In *Maynes,* we determined that "needy persons" under KRS 31.110 are not automatically "poor persons" immune to the imposition of court costs under KRS 23A.205, because the two statutory standards are different. *Id.* at 933. In sum, a trial court may impose court costs and/or public defender fees on a defendant, despite his or her indigent status based on an individual assessment of the particular defendant's situation and the relevant statutory standard.

■■■■ In its judgment, the trial court ordered Goncalves to pay $180 court costs and a $200 "partial public defender fee" upon his release. Goncalves, along with Jones and Giguere, were also ordered to pay restitution to the Boston Beverage Depot in an amount to be determined by motion of the Commonwealth. The court further ordered that the "status of payment of all financial obligations imposed herein shall be reviewed upon release." In requiring a review of Goncalves's ability to pay the ordered costs and fees upon his parole or service of the thirty-five year sentence, the trial court erroneously granted itself continuing jurisdiction in this matter. *Buster v. Commonwealth,* 381 S.W.3d 294 (Ky.2012) (there is no statutory basis for a court to exercise jurisdiction to determine the appropriateness of court costs and fees beyond the end of the proceedings). Because court costs may be waived given certain statutory findings, the trial court's determination of whether the costs should be assessed or waived must be made upon the defendant's conviction and sentencing. KRS 23A.205; *Buster,* 381 S.W.3d at 306 (the decision to assess court costs and partial public-defender fees is to be made by the trial court by or at the time of sentencing). Similarly, a determination of whether an indigent defendant can pay a partial fee for his or her representation must be made when he or she is convicted and sentenced. *Id.;* KRS 31.211(7).

In closing, we cannot say that the trial court erred in assessing court costs and a partial public defender fee against Goncalves. However, the decision to impose costs and fees based on a defendant's ability to pay must be made by the trial court upon sentencing. *Buster*, 381 S.W.3d at 305–06. The trial court erred in ordering review of Goncalves's ability to pay upon release. We therefore reverse the portion of the trial court's judgment imposing court costs and partial public defender fees and remand for further proceedings consistent with this Opinion and the dictates of *Maynes* and *Buster*.

### CONCLUSION

We reverse the portion of the Judgment imposing the $200 public defender fee and $180 in court costs, and remand for further proceedings consistent with this Opinion. In all other respects, the Judgment of the Nelson Circuit Court is hereby affirmed.

MINTON, C.J.; ABRAMSON, CUNNINGHAM, NOBLE, SCOTT, and VENTERS, JJ., sitting. All concur.